**REDDEN, Plaintiff-Appellee, v. CONSTITUTION. LIFE INSURANCE CO., Defendant-Appellant.**

Ohio Appeals, First District, Hamilton County.

No. 8630.   Decided April 11, 1960.

Gross, Jones & Blumenfeld, St. Louis, Mo., Goldman, Cole & Putnick, for plaintiff-appellee.

Bloom & Tyler, Milton M. Bloom, of Counsel, for defendant-appellant.

(HURD, PJ, KOVACHY and SKEEL, JJ, of the Eighth District, sitting by designation in the First District.)

## OPINION

By SKEEL, J.

This appeal comes to this court on questions of law from a judgment entered for the plaintiff on the verdict of a jury.   The action is

one seeking payment of monthly benefits under the terms of a contract of insurance.

The insurance policy, dated June 16, 1955, in part, provides:

" 'Injury' as used in this policy means bodily injury which is the cause of the loss and which is effected solely through accident while the policy is in force. * * *"

"Part D

"If injury shall not result in any of the specific losses described in Part A, but shall, while this policy is in force, wholly and continuously disable the insured for one day or more, the Company will pay, commencing with the first treatment by a legally qualified physician or surgeon, benefits at the rate of the Regular Monthly Benefits so long as the Insured lives and suffers total loss of time."

"Part R—Exceptions and Reductions

"This policy does not cover any loss, fatal or non-fatal, resulting from * * *

"(f) injury or sickness for any period during which the Insured is not under the professional care and regular attendance of a legally qualified physician or surgeon, other than himself."

The regular monthly benefits shown on the face of the policy for total disability are $200.00 per month.

The application for the policy, which is attached to and made a part of the policy of insurance, signed by the plaintiff at Cincinnati, Ohio, June 10, 1955, shows the following answer made by the plaintiff to these specific questions:

"5. What Accident, Sickness, Hospital or Life Insurance do you now own?

"A. Life $2500—Western & Southern * * *

"6. Have you ever made application for Accident, Sickness, Hospital or Life Insurance which has been declined, postponed or withdrawn; or has any Policy or Certificate of such Insurance issued to you been modified, rated up, cancelled or renewal refused?

"A. No.

"7. Have you ever made claim for or received benefits on account of any injury or illness?

"A. No.

"8. Do your average monthly earnings exceed the monthly benefit payable under the policy now applied for and under all other disability insurance now carried by you?

"A. Yes.

"What are your average monthly earnings?

"A. $800.00.

"9. Have you ever been operated on by a physician or surgeon?

"A. No.

"10. Have you ever had any of the following: * * * (C) Appendicitis, hernia, sprained or lame back, malaria?

"A. No.

"* * *

"11. Have you received any other medical or surgical advice or

treatment or had any local or constitutional disease within the last five years?

"A. None."

The plaintiff was a railroad engineer, employed by the New York Central System. On January 16, 1956, he met with a disabling injury when a ladder upon which he was standing to oil some part of the engine he was about to take out on a trip gave way and he fell to the ground. The accident happened at the Shelby Street Roundhouse, Indianapolis, Indiana.

On February 3, 1956, the plaintiff made application for benefits under his contract of insurance with the defendant. In this application he stated the date of the accident, and that he was admitted to St. Mary's Hospital in Cincinnati on January 17, 1956, and discharged from the hospital on January 25, 1956. The plaintiff's physician, Dr. Ralph G. Carothers, signed the medical report showing the following:

"Bruising of right elbow, strain of neck * * *. Was kept in hospital in neck traction, rest in bed, medication."

Like reports were filed by the defendant on March 3, 1956, April 3, 1956, signed by Dr. John D. Redden, with the same diagnosis but with the added statement of "in traction and cervical brace." On May 2, 1956, the same doctor reported the diagnosis to be "Radiculitis, possible ruptured cervical" and showed the treatment "In Traction Cervical Neck Brace." Two reports were filed in June, the first on June 2nd by Dr. Carroll de Courcy, on which the diagnosis is shown as "Neuritis (Cervical) Myositis-neuritis both arms" and the treatment "Solicylates—heat." The second report, signed by Dr. John D. Redden, dated June 2nd, shows the diagnosis as "Sprained neck and right elbow" and treatment as "in traction and cervical neck brace and diathermy." The last of these reports was dated July 3, 1956, signed by Dr. John D. Redden, where the diagnosis is "Radiculitis, possible ruptured disc" with the same treatment as before. All of these reports, as to the facts set out on the front page of the form furnished by the defendant, were in the handwriting of the plaintiff and signed by him. They all show (except the one filed July 3rd) that in answer to the question "Monthly Earnings?" he stated $750 to $800.

The defendant paid the plaintiff five hundred sixty-six dollars and sixty six cents for a little less than three months total disability and then refused to continue further payments and terminated the policy for alleged untruthful answers to the questions contained in the application upon the basis of which this policy was issued. Total disability also was questioned. The last payment constituted full performance of the policy provisions up to and until April 3, 1956. The plaintiff's action seeks recovery for the alleged separate monthly payments due from April 3, 1956, for each month until the filing of his petition or for thirteen months, making the claimed balance then due of $2600. The jury returned a verdict in favor of the plaintiff of $2600 costs and interest.

From the judgment entered on the verdict, the defendant in this appeal claims the following errors:

"1. The Court erred in failing to direct a verdict for the defendant at the conclusion of the plaintiff's evidence and again at the conclusion of the entire case, or in the alternative to withdraw the case from the consideration of the jury and render judgment for the defendant.

"2. The Court failed to render judgment in favor of the defendant notwithstanding the verdict of the jury.

"3. The Court erred in failing to set aside the judgment rendered for the plaintiff upon the verdict of the jury, and to grant a new trial to the defendant.

"4. The Court erred in submitting issues of fact to the jury of which there was no proof offered by the plaintiff.

"5. The Court erred in admitting testimony of the interpretation of x-ray films without requiring the introduction of said films.

"6. Plaintiff's admitted failure to exercise good faith with knowledge that the answers contained in his application for the policy of insurance in question entitled the defendant to a judgment as a matter of law.

"7. Plaintiff's evidence conclusively established that his alleged condition did not wholly and continuously disable him for the period of time he was claiming and entitled the defendant to a judgment as a matter of law.

"8. Plaintiff's evidence conclusively established that he was not under the professional care and regular attendance of a legally qualified physician or surgeon for the period of time for which he was claiming benefits and entitled the defendant to a judgment as a matter of law.

"9. The Court erred in giving certain special charges requested by the plaintiff which were contrary to law and inconsistent with previous special charges, resulting in the jury being misled, to the prejudice of the defendant."

The first four assignments of error, together with the eighth, are based, in part, upon the claim that there was no proof presented by the plaintiff supporting the requirement of the policy that liability cannot be established under Part R (f) of the contract unless the assured is, during the entire period for which benefits are claimed, under the "Professional care and regular attendance" of a duly licensed physician. The only evidence as to this requirement of the policy, as above quoted, is found in plaintiff's exhibits Nos. five to nine inclusive (benefit applications), where either weekly or bi-weekly attendance is noted for each month by the physician making the report. These reports account for the period from April 3 to July 3, inclusive, or for a period of three months. There being no evidence whatever on this necessary element of plaintiff's case for each of the months from July 3 until the filing of the petition, the judgment is, for that reason, modified to $600.00, and final judgment is entered for the appellant on appellee's claim for each of the separate months from July 3, 1956 through June 22, 1957. .

These claims of error are also based on the claim that there was evidence that the assured was suffering from a disabling condition which predated the accident. The physicians who made the monthly reports quoted above were not called as witnesses in the case nor is their

absence accounted for. The only medical evidence, except that found on the reports of the plaintiff seeking benefits and set out in such reports by the attending physicians was the testimony of a physician from St. Louis, based on two examinations of the plaintiff—one on September 21, 1956 (nine months after the accident) and the other during trial on October 22, 1958. His diagnosis is in conflict with that of the attending physicians, as above set out in quoting from the reports. Dr. Harell (from St. Louis) testified in part as follows:

"All right, now, based upon your examinations and the knowledge which you have of this man as of this very minute, what is your opinion or diagnosis as to his condition?

"A. I think that this patient, that Mr. Redden suffers from a vascular condition of the main blood vessel, subclavian artery, and the findings in his hand and arm are due to vascular changes which come and go as a result of that.

"* * *

"Q. Now, Doctor, you have testified as to your opinion of the man's condition now and what is causing it. Do you have an opinion with regard to the condition from which he was suffering as of the time you first examined him?

"A. That was the same.

"Q. The same condition?

"A. The same condition, yes, sir.

"Q. Now at the time you first examined him did you have an opinion or an impression, which to us laymen I am afraid means the same as diagnosis, but in your terminology, at the time you first saw him did you form an opinion or an impression as to the cause of his trouble?

"A. Yes, sir, I did.

"Q. And what was that opinion or impression formed at that time?

"A. I felt that the only thing I could tie it in with would be a vascular condition.

"* * *

"Q. Is your opinion as to the cause of his condition based upon reasonable medical certainty?

"A. It is based on the objective clinical findings which I found at the first examination and the additional ones which I found last night.

"Q. And is that, to use a term of art here, is that based on reasonable medical certainty?

"A. It is, sir.

"Q. The testimony shows that Mr. Redden had been injured on several occasions prior to the accident in question; that he had recovered from those injuries after varying lengths of convalescence, some of them quite substantial, and I believe one of them running to as many as seven years; that before the accident in question in this case he was working and performing the duties of his employment as a railroad locomotive engineer; that on the 17th day of January, 1956, he had mounted a ladder to investigate and service a part of the engine before making his run; that while mounted on that ladder the—

"A. What?

"Q. That he had mounted a ladder and while up on the ladder the ladder broke beneath him and that he fell down and was thrown all the way to the ground; that before the accident he had never experienced and was not experiencing the swelling of the hand, the numbness of the hand, the sweating of the hand, but that after the accident that I have spoken of he did so suffer; now taking those facts as facts, do you have an opinion based upon the reasonable medical certainty as to whether or not the condition from which he was suffering, according to your testimony, was caused by the accident in 1956?

"* * *

"A. If the facts are as stated I have an opinion.

"Q. And what is your opinion, Doctor?

"Mr. BLOOM: I object, of course, to protect our record.

"THE COURT: Overruled.

"A. If the man did not have these difficulties before and he has them following the accident it is my opinion they are a result of the accident."

These answers being based on a hypothetical question can be of value only if the assumed facts are supported by credible evidence. There is no evidence, clinical or otherwise, dealing with the physical condition of the plaintiff to support the facts upon which the hypothetical question was based. The physical symptoms assumed could have been experienced either before or after the accident of January 16, 1956, and completely disassociated therefrom and the answer of Dr. Harell was so equivocal as to be without probative effect. Nor has there ever been a claim filed with the defendant based on total disability by reason of a vascular condition as reported by Dr. Harell. The plaintiff's claims, therefore, as to each monthly period following July 3rd, are without the support of any medical evidence whatsoever. The final judgment for the defendant here entered as to the sparate claims for the months indicated is thus supported because of the absence of medical proof, and the claims for the three months preceding are considerably weakened by the conflict. The fact that the defendant has attempted to terminate the contract does not relieve the plaintiff of full compliance with its provisions. The plaintiff's action is based on the contract.

The defendant also claims that plaintiff knowingly gave false answers to questions on his application for the policy of insurance herein being litigated or failed to notify the defendant upon discovery that false answers were contained in his application over his signature. The questions and answers in the application filed by plaintiff with the defendant as the basis for inducing defendant to issue the policy are set out above. The fact that the answers are not truthful is not in dispute. The answer to question No. 5 failed to mention certain accident and health policies held by the plaintiff, three of such policies being contracts with Banker's Life and Casualty and at least one with Reserve Life Insurance Company. Both of these insurance companies were called upon by the plaintiff to pay and did pay benefits, the first because of an automobile accident in 1952 and the second on a claim of sickness, the benefit being received from "Reserve" in February of 1956, six months after the defendant issued its policy of insurance to the plain-

tiff. All of the other answers contained in the application and referred to in defendant's answer and as quoted above, were untruthful, including the plaintiff's statement of earnings which the plaintiff continued to misrepresent in the forms filed by him with the defendant in presenting the claims here in litigation, the last report being filed July 3, 1956.

The plaintiff testified that he correctly answered these questions but that the defendant's agent wrote the incorrect answers, the plaintiff thereby attempting to imply that he (the agent) wanted to be sure his company would issue the policy. He also testified that he (the plaintiff) tried to tell of accidents in 1939 and 1944, but that the agent told him he was not interested in anything earlier than five years from the date of the application. This was true because the application limited the inquiry to that period and required no explanation of injuries more than five years before the date of the application. The agent, whose deposition was taken while he was confined in The Veterans Hospital in Cincinnati, denies categorically that he wrote answers other than those given by the plaintiff. One thing, however, is perfectly clear and that is that upon or shortly after the policy was issued, the plaintiff saw the application attached to the policy, and found out then that the answers were not truthful, but he did not notify the defendant of this important fact upon discovery of the false statements.

The claims of the plaintiff that the defendant's agent suggested untruthful answers or induced the cancellation of another policy as a basis for selling the policy in question are not supported by the record. The testimony of the plaintiff is that he gave correct answers but that they were incorreclty recorded and that he did not know about it because he signed the application when it was finished without reading it and did not then discover the untruthful statements. The fact that the policy with "Reserve" was not cancelled until February, 1956, when the plaintiff received $300 in benefits in the process of its cancellation negatives the claim of inducing the cancellation of other policies. These facts, together with the fact that in taking out the policies of health, sickness and hospital insurance in 1951 with Bankers Life and Casualty Company, the applications showed similar untruthful statements which the plaintiff attempted to blame on "The Girl" who took the applications, strongly supports the testimony of the defendant's agent.

The evidence as to the plaintiff's discovery of the false statements when he received the policy comes from his own testimony where he said under oath on deposition:

"'Did you read it?' * * *

"'A. * * * I read some of it, not all of it.'

"'* * * Did you look at the copy of the application for the insurance?' "* * *

"'A. I looked at that and I told Henrietta - - * * *.'

"'Q. Not what you said to your wife, but what did you notice when you looked at the application?' * * *

"'A. I know there was some false statements.'"

And when asked what he did about it, he said: "I didn't do nothing."

The plaintiff cites **Saunders v. Ins. Co.,** 168 Oh St 55, 151 N. E. 2d 1, where the Supreme Court held:

"2. Information obtained by a soliciting agent of an insurer when making out an application for insurance is imputable to the insurer, and, in the absence of proof that the **applicant knew or should have known** that the insurer was being deceived, the insurer cannot escape liability on a subsequently issued policy by showing that its agent failed or neglected to disclose such information to it.

"3. Where an application for insurance is made out by the insurer's agent who fills in false or incorrect answers to the questions contained therein, which have been truthfully answered by the applicant, and there is no fraud, collusion **or knowledge, actual or constructive,** on the part of the applicant in connection therewith, the insurer is estopped to rely upon the falsity of such answers to avoid liability on the policy issued pursuant to the application." (Emphasis added.)

The case is to be distinguished from the case now before us for the reason that the plaintiff by his own testimony discovered (if he did not in fact make the false statements shown on the application, which fact is in great dispute) the "false statements" close to the time he received the policy and from that time on openly participated in the fraud. An insurance company is not to be held to a contract issued on false information, even if its agent was at fault (which fact is here in considerable doubt), where the insured discovers the deception before any risks under the policy had developed and both parties could be returned to their original status unharmed.

In the case of Brauman v. Prudential Ins. Co. of America, 157 N. Y. S. 2nd 631, it is said in the second paragraph of the headnotes:

"2. Insured had a duty to read life insurance application which was attached to the policy and correct any misstatements contained therein and this duty survived the completion of the application by the agent and failure of insured to read it before he signed it."

In the case of Telford v. New York Life Ins. Co., 9 Calif. 2nd 103, 69 P. 2nd 835, the court said in the fourth paragraph of the headnotes:

"4. The requirement of fair dealing is laid on both parties to a contract of life insurance, which requires the insured to read the contract and the application in accordance with his or her representations, and to report to the company any misrepresentations or omissions; and the imputation of knowledge from the fact that that portion of the insured's body showing the removal of the left breast was exposed to the medical examiner, in such case, is overcome by the failure of the insured to conform to the requirement of fair dealing, as the result of which she must be deemed to have adopted and approved as her own act the examiner's omission to convey this knowledge to the company."

Also, in the case of Hayes v. Automobile Ins. Exch., 126 Wash. 487, 218 P. 252, it is stated:

"There can be no recovery on the policy where an application for automobile insurance contained statements which assured knew to be untrue, the policy provided that the assured warranted the statements, which were relied upon by the company; and it is no excuse that assured did not read the policy."

See also, Green v. Acacia Mut. Ins. Co., 98 Oh Ap 101, at page 106, 128 N. E. 2d 222, and Bonewell v. Accident Ins. Co., 167 Mich. 274, 132 N. W. 1067.

The policy here in controversy contains the following provisions:

"This policy is issued in consideration of the statements and agreements made by the Insured in the application and the payment in advance * * *."

"Part S

"2. * * * No agent has authority to change this policy or to waive any of its provisions. * * *"

The cases cited by plaintiff excusing the need for the insured to notify an insurance company of errors in the application material to the inducing of the acceptance of the risk, discovered upon delivery of the policy, are concerned with situations where the agent writing the application assured the prospective policy purchasers that the answers to the questions involved were unimportant. No such situation is presented here. The issue is clear—did the plaintiff truthfully answer the questions on the application or reveal his medical history for five years before the date of the policy? Or did the plaintiff, upon admitted discovery of the false statements, notify the insurer? At no place in the record does the plaintiff claim that as to the five year period prior to June 16, 1955, the answers or any of them were said by the agent to be unimportant. Answering questions seeking this kind of insurance was not a new experience for the plaintiff. He had been concerned in a number of such transactions as shown by the record, three of which applications containing such wrong answers were approved by plaintiff's signature. The plaintiff owed a duty to inquire and report the errors that he admitted discovering in the application to the insured and his failure to do so is strong evidence supporting the claim that he was untruthful in answering the questions on the application.

We hold that that part of the judgment remaining (in the amount of $600.00 due for the months of April, May and June) is against the manifest weight of the evidence and for that reason is reversed and remanded for further proceedings.

HURD, PJ, KOVACHY, J, concur.

As the written opinion clearly indicates, I join with my associates in the reversal of that part of the judgment representing the installments claimed by the plaintiff to be due for the months of April, May and June of 1956 of $600.00 on the ground that that part of the judgment is against the manifest weight of the evidence requiring that part of plaintiff's case to be remanded for further proceedings. The record clearly justifies that result. I desire to express the further thought that because plaintiff's own testimony shows that he discovered the false statements over his signature in the application shortly after he received the policy with the application attached thereto and that because he did not then notify the defendant of such erroneous statements, such facts would justify entering final judgment on this part of the plaintiff's claim.